# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| YVONNE BERGERON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 1:23-cv-00093-MSM-LDA |
| ) | |
| CITY OF WOONSOCKET, through its ) | |
| Treasurer, Laura Dube; and ) | |
| RHODE ISLAND OFFICE OF ) | |
| HEALTHY AGING, through its ) | |
| Director Maria Cimini, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

In October 2022, the plaintiff, Yvonne Bergeron, sued the City of Woonsocket for a broad swath of civil rights and torts claims in Rhode Island state court. Woonsocket timely removed the case to this Court, and more than a year and two amended complaints later, Ms. Bergeron added the State of Rhode Island's Office of Healthy Aging ("OHA") as a defendant.

OHA now moves to dismiss all claims against it: some because they are time-barred, others because they fail to state a claim upon which relief can be granted or otherwise fail as a matter of law. For the reasons below, OHA's Motion to Dismiss (ECF No. 22) is GRANTED IN PART and DENIED IN PART.

# I.    BACKGROUND

As required on a motion to dismiss, the Court must accept the Second Amended Complaint's well-pleaded facts as true and discard any conclusory assertions and legal conclusions. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 723 F.3d 77, 80 (1st Cir. 2013).

## A.    The October 2019 Incident

This case revolves around two incidents at Ms. Bergeron's apartment in Woonsocket, Rhode Island.  The first began on October 24, 2019.  Ms. Bergeron describes that day's events as follows.  Around 4:00 p.m., she heard on a knock on her apartment door.  (ECF No. 14-1 ¶¶ 5–6.) She asked, "Who's there?" and a voice that she recognized as her landlord responded, "It's me, Rob."  *Id.* ¶ 6.  Ms. Bergeron opened the door, but Rob was nowhere to be found.  *Id.* ¶ 7.  Instead, there were at least seven strangers "crowded into the small hallway" outside her apartment.  *Id.* They "pushed their way into the apartment," despite Ms. Bergeron's protests, and they told her that she needed to go to the hospital.  *Id.* ¶¶ 8–9.  A longtime agoraphobic, she protested.  *Id.* ¶¶ 9, 12.  One stranger took her keys forcibly, and she was "taken out of her home, against her will, leaving her house open with people standing in the kitchen."  *Id.* ¶ 10.

Ms. Bergeron was taken to Landmark Medical Center.  *Id.* ¶ 13.  She underwent tests but was "given no information as to why she was there, when or if she would be released," and she spent the night "terrified and crying."  *Id.* ¶¶ 13–14. She was released the next day.  *Id.* ¶ 14.  When she returned home, someone claiming to be a Woonsocket employee told her that she had fifteen minutes to remove her

personal possessions from the apartment; meanwhile, an Animal Control Officer unsuccessfully tried to catch her cats. *Id.* ¶¶ 15–16.

Why had those strangers come to Ms. Bergeron's apartment on October 24, 2019? The Second Amended Complaint does not offer a reason, but records produced during discovery show that Woonsocket had condemned her apartment earlier that day.[1] (ECF No. 22-1 at 2.) The conditions were found to be "deplorable and constitute a hazard to anyone exposed to this environment." *Id.* These "strangers" were employees from Woonsocket and OHA, presumably following through on Woonsocket's condemnation order.

So, through "the end of November 2019," Woonsocket provided Ms. Bergeron only "limited access" to her apartment. (ECF No. 14-1 ¶ 17.) She was then denied "all further access" for several more weeks. *Id.* ¶ 18. At an unspecified later date, three dumpsters were filled with her possessions that she valued at over $100,000. *Id.* ¶ 21. That included family photos, personal possessions, and valuable property. *Id.* ¶ 25. Eventually, she was allowed to hire workers to access her apartment and clean it, but she was still not allowed in. *Id.* ¶ 22.

---

[1] "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire and Marine Ins.*, 267 F.3d 30, 33 (1st Cir. 2001). But an exception exists "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (internal quotation omitted). As a result, "when the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Id.* (cleaned up). Ms. Bergeron does not challenge the validity of the documents OHA offers, so the Court can properly consider them.

Ms. Bergeron explains that her agoraphobia was "exploited" by Woonsocket and OHA during this process. *Id.* ¶ 26. She believed that if she did not comply, she would have been put in a nursing home, dispossessed of her cats and personal belongings. *Id.* ¶ 24. From all this, Ms. Bergeron began suffering from PTSD, and she has experienced "ongoing mental anguish, anxiety, depression, and public embarrassment." *Id.* ¶ 27.

### B.    The May 2023 Incident

The second incident took place on May 30, 2023. *Id.* ¶ 28. That day, "an employee or representative from either the City of Woonsocket and/or [OHA]" began knocking on Ms. Bergeron's door. *Id.* ¶ 28. She did not answer, but the person "persisted" and eventually forced the lock open. *Id.* ¶ 29. The employee stepped into the kitchen with two police officers. *Id.* Ms. Bergeron does not describe what—if anything—happened next, but she then suffered "physical symptoms," like trouble sleeping and serious digestive issues. *Id.* ¶ 30.

### C.    Travel Of The Case

Ms. Bergeron filed suit alleging a bevy of civil rights and torts claims against Woonsocket in Rhode Island state court on October 23, 2022. (ECF No. 1-1 at 10.) Woonsocket timely removed the case to this Court based on federal question jurisdiction. (ECF No. 1 at 1.)

Since removal, Ms. Bergeron has amended her complaint twice: first on August 28, 2023, and then on November 16, 2023. (ECF No. 9, No. 14.) The First Amended Complaint added the May 2023 incident. (ECF No. 9 ¶¶ 28–30.) The Second

Amended Complaint added the OHA as a defendant, and it is the operative complaint. (ECF No. 14-1 ¶ 3.)  OHA now moves to dismiss the claims against it.  (ECF No. 22.)

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Ms. Bergeron must lay out a "plausible claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In other words, she must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  In evaluating a claim's plausibility, the Court must "assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008).

## III.    DISCUSSION

Ms. Bergeron has asserted ten counts against the OHA.  All ten allege harm arising from its actions during the October 2019 and May 2023 incidents; none split the allegations more precisely based on one incident or the other.  OHA argues that Ms. Bergeron's claims related to the October 2019 incident are time-barred.  The remaining allegations, it contends, fail to state a claim upon which relief can be granted or otherwise fail as a matter of law.  The Court addresses these arguments in turn.

### A.  Claims Arising From The October 2019 Incident

OHA first argues that all claims arising from the October 2019 incident are time-barred.  Ms. Bergeron responds that, under Fed. R. Civ. P. 15(c) and the relation back doctrine, the claims remain timely.  OHA has the better of the argument.

### 1.    Statute Of Limitations

To start, a three-year statute of limitations window governs a host of Ms. Bergeron's claims arising from the October 2019 incident.   Rhode Island law establishes a three-year period for all personal injury actions as well as in most cases involving the state or any subdivisions.   R.I. Gen. Laws § 9-1-14(b) ("Actions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue …"); R.I. Gen. Laws § 9-1-25(a)("[W]hen a claimant is given the right to sue the state of Rhode Island [or] any political subdivision … the action shall be instituted … within three (3) years of the accrual of any claim of tort.") That period applies to the torts alleged in Count I (unlawful trespass), Count II (invasion of privacy), Count IV (false arrest/false imprisonment), Count VIII (intentional infliction of emotional distress), Count IX (assault), and Count X (battery).

Because federal civil rights claims are typically governed by the state's statute of limitations for general personal injury torts, the three-year limit also governs Count III, alleging a Fourth Amendment violation under 42 U.S.C. § 1983, and Count VI, alleging a violation of the Americans with Disabilities Act.  *See Ouellette v. Beaupre*, 977 F.3d 127, 135 (1st Cir. 2020) (explaining that federal courts apply a

"state's designated limitations period for general personal injury torts" in analyzing timeliness for § 1983 actions); *Goldstein v. Harvard Univ.*, 77 F. App'x 534, 536 n.1 (1st Cir. 2003) ("Since the ADA does not contain a statute of limitations, courts borrow the most analogous state statute of limitations.").

The limitations period for Count VII—arising under Rhode Island's Civil Rights of People with Disabilities Act ("RICRPDA"), R.I. Gen. Laws. §42-87-1, *et seq.*—poses a more difficult question.   RICRPDA does not contain a statute of limitations, and there is scant on-point caselaw.   *See Kriegel v. Rhode Island.*, 266 F. Supp. 2d 288, 295 (D.R.I. 2003) (acknowledging that "no court has addressed this issue to date.").   The only court to confront the question head-on held that a one-year limitation period applies.   *Id.* at 295–96 (explaining that it "is clear that the legislature intended that FEPA's administrative bulwark, including its one-year statute of limitations, should also apply in actions brought under" the RICRPDA.). OHA, in turn, suggests that the logic of *Oullette* and *Goldstein* creates a three-year window for RICRPDA claims.   (ECF No. 22-2 at 7.)   The Court need not decide which timeframe is the right one, because—as explained below—under either, Count VII was untimely.

A claim typically accrues at the time of injury.[2]   *Renaud v. Sigma-Aldrich Corp.*, 662 A.2d 711, 714 (R.I. 1995).   So, Ms. Bergeron's claims accrued on or around

---

[2] Ms. Bergeron does not argue that the discovery rule applies, nor does the Court see a reason it should.   That rule stops the statute of limitations from beginning to run "until an injury or some wrongful conduct should have, in the exercise of reasonable diligence, been discovered." *Renaud*, 662 A.2d at 714–15.   But the Rhode Island Supreme Court has only applied it in "certain narrowly circumscribed factual

October 24, 2019. The statute of limitations thus expired on or around October 24, 2022, at the latest.  Ms. Bergeron did not obtain leave to add OHA until more than a year after that, far outside the limitations period.  (ECF No. 14.)  So, her claims against OHA arising from the October 2019 incident are time-barred unless the Second Amended Complaint relates back to the original complaint's filing date, October 22, 2022.

### 2. Relation Back

Fed. R. Civ. P. 15(c) governs whether it does.[3]  Because Ms. Bergeron has amended her complaint to add claims against a new party, Rule 15(c) "provides two ways in which the amended complaint can relate back to the original complaint." *Coons v. Indus. Knife Co.*, 620 F.3d 38, 42 (1st Cir. 2010).  First, Rule 15(c)(1)(C) sets out "a federal relation back test" with three essential requirements, detailed below. *Id.*  Second, and "in addition to the federal test," Rule 15(c)(1)(A) allows for relation back when "the law that provides the applicable statute of limitations," here Rhode Island law, "allows relation back." *Id.* (quoting Fed. R. Civ. P. 15(c)(1)(A)).  The First

---

situations," like medical malpractice, faulty construction, and some products liability. *Id.* at 715 (collecting cases); *Nicolo v. Phillip Morris, Inc.*, 201 F.3d 29, 31–39 (1st Cir. 2000) (reviewing and then applying Rhode Island's approach to the discovery rule). Unlike those cases, OHA's allegedly harmful conduct—like bursting into her apartment and taking her to the hospital against her will—was immediately apparent when it happened in October 2019, so application of the discovery rule is inapt.

[3] Ms. Bergeron's arguments about the relevance of the liberal amendment standard in Rule 15(a) are misplaced.  Rule 15(a) governs whether parties can amend their pleadings at all; Rule 15(c) governs when those amendments can (and cannot) be considered timely.

Circuit has "described the choice between these two provisions as 'a one-way ratchet,' meaning that a party is entitled to invoke the more permissive relation back rule, whether that is the state rule or the federal rule set out in Rule 15(c)(1)(C)." *Id.* (cleaned up).

### a. The Federal Relation Back Test

The Court first considers whether the Second Amended Complaint satisfies the federal relation back test. As described by the First Circuit, there are three elements:

> First, the claim asserted against the newly-designated defendant must satisfy the terms of Rule 15(c)(1)(B), which provides that the claim must arise out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.

> Second, within the period provided by [Federal Rule of Civil Procedure] 4(m) for serving the summons and complaint, the party to be brought in by amendment must have received such notice of the action that it will not be prejudiced in defending on the merits.

> Third, it must appear that within the same time frame the newly-designated defendant either knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

*Coons*, 620 F.3d at 42. If all three conditions are met, then the Second Amended Complaint relates back to the date of the first complaint, and Ms. Bergeron's claims against OHA arising from the October 2019 incident will be considered filed as of October 2022—and thus timely.

The first element is that the claim against the new defendant must arise from the same "conduct, transaction, or occurrence" as the original pleading. *Id.* That is

satisfied here, because the Second Amended Complaint lays out the same facts as the first complaint; it just adds OHA as another defendant.

The second element turns largely on fair notice. In part, that stems from Fed. R. Civ. P. 4(m), which requires dismissal if the plaintiff fails to serve the defendant within 90 days of filing the complaint. Still, "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.* But Rule 15(c) does not "require that a new party receive actual notice of the action," meaning service, so long as there is a showing "of constructive notice" within the 90-day Rule 4(m) period. *LaCedra v. Donald W. Wyatt Det. Facility*, 334 F. Supp. 2d 114, 129 (D.R.I. 2004).

So the central inquiry is whether "the new party, when viewed from the standpoint of a reasonably prudent person, should have expected that the original pleading might be altered or called into question." *Id.* Courts have found sufficient notice in at least four circumstances. First, there is sufficient notice "when an employee who is authorized to receive a summons does not reject a summons that names a non-existent party." *Id.* Second, the original complaint can give a new defendant constructive notice "when the substance of the original complaint alleges that the new defendant committed the illegal acts described therein and is an official of one of the original defendants." *Id.* Third, a new defendant has constructive notice "when he or she retains the same attorney as an original defendant and that attorney should have known that the new defendant would be added to the existing lawsuit." *Id.* Finally, there is also sufficient notice "when the original and newly-added

defendants share an identity of interests," meaning the original and new defendants "are sufficiently aligned that it is fair to presume that the new defendant learned of the institution of the action from the original defendant." *Id.* at 129–30.

The original complaint was filed on October 24, 2022. (ECF No. 1-1. at 1.) OHA did not waive service until February 2024, far outside the 90-day window prescribed in Rule 4(m). (ECF No. 21.) Ms. Bergeron has not shown that there was "good cause for the failure" to carry out timely service, either. She has thus failed to satisfy Rule 4(m)'s actual service requirement.

Nor does this case fit into any of the four well-established constructive notice situations. First, the case does not involve an employee accepting service for a non-existent party, and second, OHA and its agents are not also officials of Woonsocket, as far as the Court can tell. *LaCedra*, 334 F. Supp. 2d at 129. Third, a review of the docket reveals that Woonsocket and the OHA do not share an attorney. *Id.* And fourth, Ms. Bergeron has failed to show that Woonsocket and OHA are "sufficiently aligned that it is fair to presume that the new defendant learned of the institution of the action from the original defendant." *Id.* at 129–30. The second element is thus not satisfied.

Neither is the third element, requiring a "mistake concerning the proper party's identity." *Coons*, 620 F.3d at 42. Ms. Bergeron originally sued Woonsocket in 2022, and only in 2023 did she add OHA as a defendant. In her brief, she argues (1) that a mistake occurred during discovery concerning an OHA agent's identity, (2) that once she learned about the mistake, she knew that OHA was involved and

amended the complaint promptly, and (3) that the mistake here satisfies Rule 15(c). (ECF No. 33 at 3–4.)

That position is wrong on the facts and the law. As to the facts: in November 2021, before she filed any lawsuit, Ms. Bergeron—through counsel—submitted a letter to Woonsocket identifying a "representative from the Rhode Island Department of Elderly Affairs" (among others) at her door on October 24, 2019. (ECF No. 22-1 at 8.) If OHA's involvement was known in 2021, there was no good reason to omit it as a defendant in the original 2022 filing, regardless of any confusion about a particular OHA agent's identity during the discovery period that post-dated the suit's filing.

As to the law: this Court has explained that a "mistake under Rule 15(c) is a mistake in nomenclature," meaning that it occurs only "when the correct party is before the court but called by the wrong name." *Phoenix v. Day One*, No. 1:20-cv-00152-MSM-PAS, 2021 WL 4193197, at *1 (D.R.I. Sept. 15, 2021). OHA is "an entirely different entity" than Woonsocket, and "the mistake that occurred stemmed from a lack of knowledge," or perhaps here, error in strategy, "rather than an error in nomenclature." *Id.* That is not a "mistake concerning the proper party's identity" embraced by Rule 15(c). *Id.*; *see also Gen. Linen Serv., Inc. v. Gen. Linen Serv. Co.*, No. 12-cv-111-LM, 2015 WL 471011, at *4 (D.N.H. Feb. 4, 2015) (naming one entity when the real party is a different one is a confusion of roles, not a mistake in identity).

The Second Amended Complaint's addition of OHA thus does not relate back under the federal test.

### b.    The Rhode Island Relation Back Test

That leaves Rhode Island law.  But the Rhode Island relation back doctrine mirrors the federal doctrine.  Rhode Island Rule 15(c) provides:

> (c) Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing or adding a plaintiff or defendant or the naming of a party relates back if the foregoing provision is satisfied and within the period provided by Rule 4(1) for service of the summons, complaint, Language Assistance Notice, and all other required documents, the party against whom the amendment adds a plaintiff, or the added defendant:
>
> > (1) Has received such notice of the institution of the action that the party would not be prejudiced in maintaining a defense on the merits; and
> >
> > (2) Knew or should have known that but for a mistake the action would have been brought by or against the plaintiff or defendant to be added.

R.I. Super. R. Civ. P. 15(c) (emphasis added).  This rule parallels the federal rule in every material way.  *Hall v. Ins. of N. Am.*, 727 A.2d 667, 669 (R.I. 1999) ("Our Rule 15 of the Superior Court Rules of Civil Procedure (governing the amendment of pleadings) is virtually identical to its federal analogue, Rule 15 of the Federal Rules of Civil Procedure.")  For a party's addition to relate back under state law, the amended pleading must arise "out of the conduct, transaction, or occurrence" laid out in the original pleading; adding a party must either satisfy state-law service rules or otherwise not prejudice the new party; and mistaken identity must be involved.  R.I. Super R. Civ. P. 15(c).

The Court need not repeat the analysis in full, because the result is the same. Although the "same occurrence" element is satisfied here too, the second and third elements are not; that is fatal to Ms. Bergeron's position. So the Rhode Island relation back test does not allow the Second Amended Complaint to relate back either.

Accordingly, Counts I, II, III, IV, VI (insofar as it relies on federal law), VII, VIII, IX, and X are dismissed against OHA as they relate to the October 2019 incident.

### 3. Lack Of Cause Of Action

Two claims related to the October 2019 incident were not considered above because there is no applicable statute of limitations.

Under Count V, Ms. Bergeron argues that OHA violated her right "to be free from intimidation and excessive use of force by persons acting under color of state law," in violation of Art. I, § 6 of the Rhode Island Constitution. R.I. Const. Art. 6. But this Court has previously examined Art. I, § 6 in detail and concluded that it does not create a private cause of action. *See Ricci v. Rhode Island*, No. 1-20-cv-00543-MSM-PAS, 2023 WL 4686025, at *11 (D.R.I. July 21, 2023). Ms. Bergeron has provided no evidence to convince the Court to change its position on that question.

Under Count VI, as much as it relies on the Rhode Island Constitution, Ms. Bergeron asserts that OHA discriminated against her based on her disabilities in violation of Art. 1, § 2. But the Rhode Island Supreme Court has declined to recognize a direct cause of action in Art. 1, § 2. *Doe v. Brown Univ.*, 253 A.3d 389, 398–401 (R.I. 2021) (explaining that it "expresses only general principles and does not supply a

sufficient rule of law by which the rights under the clause may be enjoyed, protected, and enforced"); *see also Parente v. Wall*, 708 F. Supp. 3d 192, 205 (D.R.I. 2023). Again, Ms. Bergeron has provided no authority to convince the Court that the Rhode Island Supreme Court's position has changed.

Counts V and VI (to the extent that it relies on the Rhode Island Constitution) are dismissed because the Rhode Island Constitution does not provide a private cause of action.

In sum, all the counts against OHA arising from the October 2019 incident are dismissed. Most counts are untimely, and the remaining counts, Counts V and VI, do not support a private cause of action.

### B.    Claims Arising From The May 2023 Incident

That leaves claims arising from the May 2023 incident. OHA argues that some claims fail as a matter of law and that others fail to plead essential elements.[4] The Court addresses each claim individually.

#### 1.    Count I: Unlawful Trespass

Count I alleges trespass: OHA entered Ms. Bergeron's home against her will. (ECF No. 14-1 at 5–6.) In Rhode Island, a party claiming trespass must show (1) the

---

[4] OHA also argues that Ms. Bergeron's allegations do not necessarily implicate it because the employee was from "either the City of Woonsocket and/or the State of Rhode Island Office of Healthy aging." (ECF No. 14-1 ¶ 28.) But in evaluating a claim's plausibility at the motion to dismiss stage, the Court must "give the plaintiff the benefit of all reasonable inferences." *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008). The Court takes that to include the reasonable inference that the employee was from OHA, at least for purposes of resolving this motion. If OHA can provide evidence that the employee at Ms. Bergeron's home in May 2023 was not affiliated with OHA, the Court will consider that at the summary judgment stage.

adverse party intentionally entered onto the owner's property; and (2) the plaintiff had rightful possession of the property. *See Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc.*, 382 B.R. 178, 179 (D.R.I. 2008) (discussing Rhode Island trespass law).

Ms. Bergeron's allegations about the May 2023 incident lay out a prima facie trespass claim. After Ms. Bergeron refused to answer the door, an OHA employee "forced the lock" on it and "stepped into" her kitchen with two police officers. (ECF No. 14-1 ¶¶ 28–29.) That adequately describes an intentional entry, and Ms. Bergeron of course has rightful possession of her own apartment.

OHA argues that the claim should be dismissed because the entry was privileged. But privilege is better understood as an affirmative defense to trespass, rather than an element the plaintiff must prove the defendant lacked. And affirmative defenses can be adjudicated on a motion to dismiss only if "the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information" and "those facts suffice to establish the affirmative defense with certitude." *Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 12 (1st Cir. 2004).

That is not the case here. True, OHA has a general statutory duty to protect the elderly. *See* R.I. Gen. Laws § 42-66-4(b)(3). But that does not give it carte blanche to enter any elderly person's home in the state. It is unclear from the Second Amended Complaint that there was a proper basis for entry in May 2023, years after the original condemnation order.

16

The Court denies OHA's Motion to Dismiss Count I, as it relates to the May 2023 incident.

### 2.    Count II: Invasion Of Privacy

Count II alleges invasion of privacy: OHA invaded Ms. Bergeron's "peace, seclusion, and solitude when they entered her home by ruse." (ECF No. 14-1 at 6.) In her brief, Ms. Bergeron appeals to both the Rhode Island statutory right to privacy and the U.S. Constitution's right to privacy in the Fourth Amendment. But the pleading suggests that this claim only relates to Rhode Island privacy law, because it was not—unlike other claims she asserts—brought under 42 U.S.C. § 1983. The Court will thus only consider the state-law privacy question.

In Rhode Island, "the right to privacy is statutory." *Deaton v. Town of Barrington*, 2023 WL 2682302, at *7 (D.R.I. 2023); *see also Pontbriand v. Sundlun*, 699 A.2d 856, 871 n.12 (R.I. 1997) ("[W]e recognize that in this jurisdiction the only right to privacy is statutory in origin."). R.I. Gen. Laws § 9-1-28.1(a)(1) establishes "[t]he right to be secure from unreasonable intrusion upon one's physical solitude or seclusion." To recover, Ms. Bergeron must show that there was "an invasion of something that is entitled to be private or would be expected to be private" and the "invasion was or is offensive or objectionable to a reasonable man." *Id.* § 9-1-28.1(a)(1)(i)(A)–(B).

OHA concedes that Ms. Bergeron's apartment "was a place entitled to be private." (ECF No. 22-2 at 22.) It argues instead that the statutory privacy cause of action "does not extend to public officials who have a legitimate reason to be on the

17

property for official business." *Koolen v. Town of Warren*, 33 F. Supp. 3d 94, 98 (D.R.I. 2014). But the narrow record before the Court does not make obvious any legitimate reason for the officials' breaking-and-entering Ms. Bergeron's property. During discovery, OHA may well lay a foundation to assert that privilege on a motion for summary judgment, but at this early stage, dismissal is inappropriate.

OHA separately argues that sovereign immunity defeats this claim, but the Court disagrees. Rhode Island and all its political subdivisions have waived their sovereign immunity privileges "in all actions of tort." R.I. Gen. Laws § 9-31-1(a). So the question becomes whether claims brought under the Rhode Island Privacy Act ("RIPA") are "actions in tort" under that broad waiver. *Cf. Parente v. Lefebvre*, 122 F.4th 457, 462–63 (1st Cir. 2024) ("For Rhode Island to have waived its sovereign immunity for civil rights claims under RICRA, those claims need to be considered 'actions of tort' under the State Tort Claims Act. R.I. Gen. Laws § 9-31-1(a)."); *id.* at 464 ("The more precise question is whether the text of the State Tort Claims Act, properly construed, includes waiver of immunity over RICRA claims."). To the Court's knowledge, the Rhode Island Supreme Court has never expressly answered this question.

Still, its treatment of RIPA leads the Court to conclude that the claims RIPA created are part of the state's waiver of sovereign immunity "in all actions of tort." Consider the Act's origins. *See Pontbriand v. Sundlun*, 699 A.2d 856, 862–67 (R.I. 1997) (describing RIPA's origins). In 1909, the Rhode Island Supreme Court determined "that no action for violation of a right of privacy existed at common law

in this state," because "the creation of such rights and remedies was a legislative rather than a judicial function." *Id.* at 863 (describing *Henry v. Cherry & Webb*, 73 A. 97, 99 (R.I. 1909)). It reiterated that holding in 1979, and in 1980, the state legislature codified privacy rights. R.I. Gen.Laws § 9-1-28.1(a). And in "passing § 9–1–28.1, the legislature explicitly afforded protection to the four interests encompassed within the 'common law tort' recognized by the Restatement though not recognized as such in this state." *Pontbriand*, 699 A.2d at 863. In other words, RIPA created causes of action for a traditional common-law tort. Moreover, the Rhode Island Supreme Court described the claim that Ms. Bergeron now asserts as the "tort of intrusion." *Id.* at 863–64 (also referring to it as a "tort of invasion of privacy").

Both because RIPA codified common-law torts and because the Rhode Island Supreme Court called this cause of action "the tort of intrusion," the Court concludes that Ms. Bergeron's claim falls within the State Tort Claims Act's scope. *See W. Rsrv. Life Assur. Co. v. ADM Assocs., LLC*, 737 F.3d 135, 136 (1st Cir. 2013) ("[T]he Rhode Island Supreme Court is the ultimate arbiter of matters of Rhode Island law.").

The Court will not dismiss Count II, as it relates to the May 2023 incident and liability arising from RIPA.

### 3.    Count III: Fourth Amendment Violation

Count III alleges a Fourth Amendment violation: OHA violated Ms. Bergeron's "right to security and privacy of her home" by forcibly entering it and taking "possession of the premises and its contents without affording her due process of law." (ECF No. 14-1 at 6.)

The Second Amended Complaint does not explicitly state whether Ms. Bergeron is suing OHA and its director in their official or personal capacities. OHA is not a "person" within the meaning of 42 U.S.C. § 1983, so it cannot be held liable in its official capacity for money damages for any alleged constitutional violation. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.") The same is true for its director, who cannot be held vicariously liable for any employee's conduct. *Id.* at 70–71.

Assuming, as the allegations suggest, that Ms. Bergeron is instead proceeding against the unnamed OHA employee who entered her home in their personal capacity, the Court considers the Fourth Amendment claim on its merits. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It applies to the states through the Fourteenth Amendment. *See Torres v. Madrid*, 592 U.S. 306, 314 (2021).

An arbitrary government intrusion into the home is the quintessential Fourth Amendment violation. *See, e.g.*, *Mapp v. Ohio*, 367 U.S. 643, 660 (1961) (explaining that "the right to be secure against rude invasions of privacy by state officers is" ultimately "constitutional in origin"); *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). At the Amendment's "very core," the Supreme Court has said, "stands the right of a man to retreat into his own home and there be free from unreasonable governmental

intrusion." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (cleaned up). Put differently, "freedom" in one's own "dwelling is the archetype of the privacy protection secured by the Fourth Amendment," while "physical entry of the home is the chief evil against which [it] is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (cleaned up).

The Fourth Amendment "generally requires the obtaining of a judicial warrant" before a state officer can enter a home without permission. *Lange v. California*, 594 U.S. 295, 301 (2021) (cleaned up). "But not always: the warrant requirement is subject to certain exceptions." *Id.* (cleaned up). Relevant here, the Supreme Court has made clear that state officers can enter a private property to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (cleaned up).

OHA goes to great lengths to invoke this exception in its briefs. (ECF No. 22-2 at 14–16.) But the Second Amended Complaint and the state's papers do not provide this Court enough material to determine now that an exigent circumstance existed as a matter of law. Instead, the allegations—a seemingly unprompted break-in by the OHA four years after a condemnation—only support the conclusion that a de facto Fourth Amendment violation occurred in May 2023.

Having found that Ms. Bergeron has alleged an adequate Fourth Amendment violation, the Court next considers qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Courts should follow a two-part inquiry in order to determine whether a defendant is entitled to qualified immunity." *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (citing *Pearson*, 555 U.S. at 232). They should "first ask 'whether the facts that a plaintiff has alleged … make out a violation of a constitutional right.'" *Id.* (alteration in original) (quoting *Pearson*, 555 U.S. at 232). Second, they should ask whether the right at issue was "clearly established": at the time of defendant's alleged misconduct. *Id.* (quoting *Pearson*, 555 U.S. at 232).

Whether a right was clearly established is also a two-part inquiry. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* (citing *Wilson v. City of Boston*, 421 F.3d 45, 57–58 (1st Cir. 2005)).

"The Supreme Court has emphasized the importance of resolving immunity questions at the earliest possible stage in litigation. To this end, the defense sometimes can be raised and evaluated on a motion to dismiss." *Haley*, 657 F.3d at 47 (cleaned up). That said, "[i]t is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity, and

courts often evaluate qualified immunity defenses at the summary judgment stage." *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010).

As explained above, Ms. Bergeron has alleged an adequate Fourth Amendment violation. It is clearly established that the Fourth Amendment principally protects people's homes. As to whether an "objectively reasonable official" in the OHA employee's shoes would have known that their conduct violated that rule of law, the Court finds that this inquiry requires a more robust factual record. Without more information from the parties, the Court cannot determine whether exigent circumstances justified the entry into Ms. Bergeron's home; that bears on the Fourth Amendment claim, as well as the inquiry into whether an objectively reasonable official in the OHA's employee's position would have known that their conduct violated the law. The Court thus declines to address qualified immunity on this far-from-complete record and will revisit it at summary judgment.

The Court will not dismiss Count III, as much as it is an individual capacity claim against an unnamed OHA representative relying on the May 2023 incident. It will revisit qualified immunity and the applicability of any exigent circumstances on a more complete record.

### 4.    Count IV: False Arrest/False Imprisonment

Count IV alleges false arrest and imprisonment: OHA held Ms. Bergeron against her will. (ECF No. 14-1 at 6–7.) To establish a claim for false arrest or imprisonment, a plaintiff must show that (1) the defendant intended to confine him or her, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement, (4) the confinement was not otherwise privileged and (5) the plaintiff was detained without legal justification. *Dyson v. City of Pawtucket*, 670 A.2d 233, 239 (R.I. 1996).

OHA argues that no allegations that relate to the May 2023 incident support any elements for false arrest or imprisonment. It is right. Ms. Bergeron's description of the 2023 incident—simply a forced entry by OHA—does not allege facts for a plausible false arrest or imprisonment claim.

Count IV is dismissed against OHA as it relates to the May 2023 incident.

### 5.    Count V: Excessive Force

As described above, Art. I, § 6 of the Rhode Island Constitution does not provide a private cause of action. Count V is thus dismissed against OHA.

### 6.    Count VI: Disability-based Discrimination

As described above, Art. 1, § 2 of the Rhode Island Constitution does not provide a private cause of action. Count VI is thus dismissed against OHA to the extent that it relies on the Rhode Island Constitution.

That leaves the ADA claim. Count VI asserts that OHA discriminated against Ms. Bergeron under the ADA "based on her disabilities through concerted and individual actions" because "they failed to provide accommodations" for her and "training for their agents and employees." (ECF No. 14-1 at 7.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132. To allege an ADA claim under Title II, Ms. Bergeron must show: (1) that she qualifies as a disabled individual under the statute, (2) that she was excluded from participation in or denied benefits provided by OHA, or otherwise discriminated against, and (3) that the discrimination was because of the disability. *See Buchanan v. Maine*, 469 F.3d 158, 170–71 (1st Cir. 2006).

Ms. Bergeron's agoraphobia seems to satisfy the first element. It is a "mental impairment that substantially limits one or more" major life activities, including "interacting with others" and "working." 28 C.F.R. § 35.108(a)(1)(i), § 35.108(c)(1)(i). It is also "recorded," at least based on the Second Amended Complaint's allegations. (ECF No. 14-1 ¶ 12.) That said, Ms. Bergeron fails to allege any subsequent discrimination or disability-related causation in her description of the May 2023 incident, so neither the second nor the third elements are satisfied.

Count VI, as it relates to the May 2023 incident, is thus dismissed against OHA as much as it relies on the ADA.

### 7. Count VII: Violations Of The Rhode Island Civil Rights of People with Disabilities' Act

Count VII alleges violations of the RICRPDA: OHA was informed of Ms. Bergeron's disability and "refused to offer accommodations" or "properly accommodate" her. (ECF No. 14-1 at 7-8.)

Courts have largely held that failure of a claim under federal disability law means the same fate for related state-law claims. *See Washington v. Honeywell Int'l, Inc.*, 323 F. Supp. 3d 309, 317–18 (D.R.I. 2018) ("The Court's analysis of these three

statutory disability claims fall under a single analytical framework derived from case law based on the Americans with Disability Act."); *Kriegel*, 266 F. Supp. 2d at 296 (collecting cases). The Court has held that Ms. Bergeron has failed to state a claim under the federal ADA. Seeing no meaningful legal difference between the federal and state claims, the Court concludes that her state-law claim fails, too.

Count VII is dismissed against OHA as it relates to the May 2023 incident.

### 8. Count VIII: Intentional Infliction Of Emotional Distress

Count VIII alleges intentional infliction of emotional distress: OHA intentionally caused Ms. Bergeron "to suffer mental anguish and distress," as manifested by "trouble sleeping and serious digestive issues." (ECF No. 14-1 at 8.) To impose liability for the intentional infliction of emotional distress, Ms. Bergeron must prove the following four elements: "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Swerdlick v. Koch*, 721 A.2d 849, 862 (R.I. 1998). Further, there must be "medically established physical symptomatology." *Id.* at 863.

To define what constitutes "extreme and outrageous conduct," the Rhode Island Supreme Court has looked to the Restatement (Second) of Tort's approach. *Id.* Under that approach, "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) Torts, § 46 cmt. d.

That standard is fatal to Ms. Bergeron's claim. For example, it is not enough that OHA "acted with an intent which is tortious or even criminal, or that [it] has intended to inflict emotional distress, or even that [its] conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive liability for another tort." *Id.* The alleged conduct here—a simple breaking-and-entering that may well have been a lawful wellness check—does not clear that high bar.

Count VIII is dismissed against OHA as it relates to the May 2023 incident.

### 9.    Count IX: Assault

Count IX alleges assault: OHA put Ms. Bergeron in "reasonable fear of imminent bodily harm." (ECF No. 14-1 at 8.) To sustain an assault claim, Ms. Bergeron must allege "a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm," and the apprehension of injury renders the defendant's act compensable. *Broadley v. State*, 939 A.2d 1016, 1021 (R.I. 2008) (internal quotations omitted).

Ms. Bergeron does not allege enough. The May 2023 allegations describe a breaking-and-entering, but that is not a "physical act of a threatening nature" that would reasonably put Ms. Bergeron in "fear of imminent bodily harm." *Id.* The assault claim fails as a matter of law.

Count IX is dismissed against OHA as it relates to the May 2023 incident.

### 10.    Count X: Battery

Finally, Count X alleges battery.  (ECF No. 14-1 at 8-9.)  To sustain a battery claim, Ms. Bergeron must allege "an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault." *Broadley,* 939 A.2d at 1021 (internal quotations omitted).

Again, Ms. Bergeron does not allege enough.  Nothing from the May 2023 allegations involved "offensive contact" with her person, so the battery claim fails as a matter of law.

Count X is dismissed against OHA as it relates to the May 2023 incident.

## CONCLUSION

OHA's Motion to Dismiss (ECF No. 22) is GRANTED IN PART and DENIED IN PART.  It is DENIED as to Counts I, II, and III, as much as those counts relate to the May 2023 incident.  It is GRANTED as to all other counts.

IT IS SO ORDERED.

Mary S. McElroy,
United States District Judge

February 21, 2025